HOGAN v. NEW YORK CENT. & H. R. R. CO.

(Circuit Court of Appeals, Second Circuit. April 13, 1915.)

No. 225.

1. ELECTION OF REMEDIES ⊙⇒12—ACTION UNDER EMPLOYERS' LIABILITY ACT.
Where a right of action for the injury or death of an employé exists under federal Employers' Liability Act April 22, 1908, c. 149, 35 Stat. 65 (Comp. St. 1913, §§ 8657–8665), the remedy thereunder is exclusive, and the bringing and subsequent discontinuance of an action at common law or under a state statute does not constitute an election of remedies which will bar a later suit under the federal statute.

[Ed. Note.—For other cases, see Election of Remedies, Cent. Dig. § 15; Dec. Dig. ⊙⇒12.]

2. MASTER AND SERVANT ⊙⇒113—MASTER'S LIABILITY FOR INJURY TO SERVANT —NEGLIGENT CONSTRUCTION OF ROUNDHOUSE.
Plaintiff's intestate, who was engineer and hostler at a roundhouse of defendant railroad company, attempted to mount a moving engine which was being brought out by his fireman at a point from three to eight feet within the doorway, and was caught between the tender and the side of the doorway and killed. The engine was of the large modern type, and the clearance between its overhang and the side of the doorway was but eight inches, while in newer roundhouses a larger clearance was provided. Deceased was not directed nor required to mount the engine at that point, and the danger of doing so was obvious. Held, that, the width of the doorway being sufficient for all ordinary and proper uses, defendant was not chargeable with negligence because it was not made wider.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 213, 224–227; Dec. Dig. ⊙⇒113.]

In Error to the District Court of the United States for the Western District of New York.

This cause comes here on writ of error to the United States District Court for the Western District of New York to review a judgment entered in that court, on June 15, 1914, upon the direction of a verdict by the court in favor of the defendant and against the plaintiff upon the merits and for the sum of $106.41 costs.

The plaintiff first brought her action in the proper court of the state of New York. The action in that court was brought under the state Employers' Liability Act, and plaintiff obtained a verdict in the sum of $18,375, which verdict was subsequently reduced to $12,000 by the trial court, upon the ground that it was excessive, and judgment was entered for that amount and

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

costs. The New York Court of Appeals reversed the judgment upon the ground that defendant was not negligent, and also because decedent was guilty of contributory negligence as a matter of law. A new trial was granted. Hogan v. N. Y. C. & H. R. R. R. Co., 209 N. Y. 20, 102 N. E. 555 (1913). The action in the state court was thereupon discontinued, and this action was commenced in the United States District Court. The facts are stated in the opinion.

Newell, Chapman & Newell, of Syracuse, N. Y. (Harry E. Newell, of Syracuse, N. Y., of counsel), for plaintiff in error.

Harris, Beach, Harris & Matson, of Rochester, N. Y. (Willis A. Matson, of Rochester, N. Y., of counsel), for defendant in error.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. This action was brought under the Federal Employers' Liability Act of April 22, 1908, c. 149, 35 Stat. 65, as amended April 5, 1910, c. 143, 36 Stat. 291 (Comp. St. 1913, §§ 8657, 8665). The plaintiff is the administrator of Frank Hogan, who died from an injury sustained while in defendant's service. He was employed by defendant as an engineer and hostler upon its railroad, and it is alleged and not denied that at the time he met his death he was engaged in interstate commerce, as he was making ready an engine which was to draw a freight train from Rochester, N. Y., to Corning, N. Y., there being in the train cars that were to be pulled by another engine from Corning to Newberry Junction, Pa., over a branch line of defendant's road running from Corning to Williamsport, Pa.

The action might have been brought in the state courts of New York under the act of Congress as amended in 1910, for the amendment provides that:

"The jurisdiction of the courts of the United States under this act shall be concurrent with that of the courts of the several states, and no case arising under this act and brought in any state court of competent jurisdiction shall be removed to any court of the United States."

[1] The action which was brought in the New York court was not, however, brought under the federal act, but under the Employers' Liability Act of New York. The Supreme Court of the United States in Second Employers' Liability Cases, 223 U. S. 1, 53, 32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44 (1912), had before it the question whether the Federal Employers' Liability Act superseded the laws of the states in so far as the latter covered the same field, and answered the question in the affirmative. However, the action in the state court under the state law was discontinued, and a new suit was commenced in the District Court of the United States for the Western District. The defendant in the answer put in, in the new action, set up "the election" of the complainant to proceed under the New York law and in the New York courts, and that the proceeding in the state court constituted a bar to this action, although the action in the state court had been discontinued with defendant's consent. This theory seems later to have been abandoned, as it was not urged in this court. It need not therefore be considered, and yet it may be well to state that we fail to see how the commencement and subsequent discontinuance of the action in the state court and under the state law could estop

the complainant from bringing her action in a federal court. In Snow v. Alley, 156 Mass. 193, 195, 30 N. E. 691, 692 (1892), Mr. Justice Holmes, now of the Supreme Court of the United States correctly stated the doctrine of election when he said:

"Election exists when a party has two alternative and inconsistent rights, and it is determined by a manifestation of choice. Metcalf v. Williams, 144 Mass. 452, 454 [11 N. E. 700]. But the fact that a party wrongly supposes that he has two such rights, and attempts to choose the one to which he is not entitled, is not enough to prevent his exercising the other, if he is entitled to that. There would be no sense or principle in such a rule. Butler v. Hildreth, 5 Metc. 49, 52; Snow v. Alley, 144 Mass. 546, 554, 560 [11 N. E. 764, 59 Am. Rep. 119]; Whiteside v. Brawley, 152 Mass. 133, 135 [24 N. E. 1088]; Morris v. Rexford, 18 N. Y. 552, 557."

Inasmuch as the Federal Employers' Liability Act supersedes all state legislation, an employé who has a right of action under the statute has but one remedy, namely, that under the federal act (see Thornton's The Federal Employers' Liability and Safety Appliances Act, § 19, and the cases there cited) he is not, by bringing and discontinuing an action at common law or under a state statute, barred by the doctrine of election of remedies from subsequently bringing his action under the federal statute. See note to Lamphere v. Ore. R. & Nav. Co., 47 L. R. A. (N. S.) 78. Before the amendment of 1910, the cause of action which the act created in behalf of the injured employé did not survive his death nor pass to his representatives. But the act in case of death of the employé from his injury created a new and distinct right of action for the benefit of the defendant's relatives named in the statute. And the damages which the defendant's relatives were thus entitled to recover were strictly limited to the loss which resulted to them because of the wrongful death, which deprived them of a reasonable expectation of pecuniary benefits. American Railroad Co. of Porto Rico v. Didricksen, 227 U. S. 145, 33 Sup. Ct. 224, 57 L. Ed. 456 (1913). The amendment of April 5, 1910, added section 9 to the original act, and provided:

"Sec. 9. That any right of action given by this act to a person suffering injury shall survive to his or her personal representative, for the benefit of the surviving widow or husband and children of such employé, and, if none, then of such employé's parents; and, if none, then of the next of kin dependent upon such employé, but in such cases there shall be only one recovery for the same injury." 36 Stat. 291.

It has been held that the cause of action which survives under this amendment does not survive for the benefit of the deceased's estate, but only for the benefit of the relatives stated in the act and in the order specified, and that if no such relatives survive, no right of recovery is given by the amendment. Thomas v. Chicago & N. W. Ry. Co. (D. C.) 202 Fed. 766 (1913). But that question is not involved in the present action, as the dead man was survived by his widow, and she sues as administratrix to recover for herself and the next of kin on the cause of action given by the original act of 1908 for the benefit of the surviving widow for the death of the employé. The language of the act provides in its first section that a common carrier engaged in commerce between the states—

"shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employé, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employé; and, if none, then of such employé's parents; and, if none, then of the next of kin dependent upon such employé, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employés of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." 35 Stat. 65.

The complaint alleged that the plaintiff and next of kin have sustained damages in the sum of $50,000 on account of the death of the deceased.

The plaintiff's intestate was in the employ of the defendant as hostler at its engine house at Rochester, N. Y., and had been so employed for a period of two months and a half before the accident which resulted in his death. Prior to that time he had been an engineer upon the road for eight or nine years in the freight service. As hostler he was rated as an engineer, and drew an engineer's pay. His duties as hostler consisted in moving engines in and out of the engine house, turning them, getting them ready to go out on their runs, moving them over to the shops or around the yard, seeing that the engine was made ready and properly cleaned, that it had the proper amount of fuel and water on, and was properly placed upon the storage tracks so as not to block other engines, and that it was left in the proper condition with the reverse lever in the center and cylinder cocks open and steam escaping. In the performance of these duties he was aided by a fireman who was subject to his orders and directions.

[2] On the night of the accident, which happened on the night of March 17, 1912, at about 8:30 o'clock, the deceased was standing in the roundhouse from three to eight feet from the doorway, conversing with his foreman, who instructed him to prepare for use two other engines then in the roundhouse. While this conversation was going on engine No. 2951 was slowly approaching at a speed of from three to four miles an hour. The foreman had previously instructed the deceased to have the engine turned around, the fire cleaned, and that it be supplied with a tank of water and gotten ready for a run to Corning. The fireman and assistant had turned this engine into the roundhouse, placed it on the turntable and turned it and it was moving slowly towards the deceased on its way out of the roundhouse to be filled with water. As it reached him about three to eight feet from the doorway through which it had to pass, the deceased jumped on one of the steps of the engine catching hold of the grab handles, but before he could reach a safe position on the engine he was caught between the tender and the door jamb and killed. And this action was brought by the administratrix against the defendant railroad to recover for his death on the ground that it had failed to provide him a safe place in which to work. The claim is that the doorway where he was killed and through which he was required to move engines was defective, dangerous, and unsafe, and so narrow that insufficient clearance existed between the side of the engine and the vertical wall of the doorway, which was maintained too close to the track; that it was feasible and

practicable at a small expense to have widened the doorway and thus have furnished proper and sufficient·clearance; and that the failure to do so was negligence which entitled the plaintiff to recover, or made it the duty of the court to submit the facts to the jury.

The roundhouse, alleged not to have been a reasonably safe place in which to perform the work the deceased was required to do, was constructed some 40 years ago, at a time when the engines in use were of a much smaller size and type and had a much less overhang than those in use at the time of the accident. The doorway, through which the engine passed when the deceased was killed, was only 11 feet in width. An engine of the size and type of No. 2951 overhung the gauge of the rail 30 inches, and when passing through the doorway in question left a clearance of but 8·inches. An engine of the size formerly used had an overhang of 21 inches, and when passing through the doorway in question left a clearance of 16 inches. It also appeared that in the roundhouses more recently built an engine of the type of No. 2951 would have a clearance of 22 inches at Utica, of 12 inches at Syracuse, and 15 inches at East Syracuse, and 20 inches at Minoa. It was shown, too, that the doorway in question might have been widened at a cost of about $200.

Plaintiff's intestate was thoroughly familiar with the conditions existing at the roundhouse. He had worked there as a hostler for about three months, and before that had been a freight engineer for eight years, and while working as such engineer went to the roundhouse to get his engine as often as he would make a trip. During the eight years he served as engineer the practice required him to take his engine through this very doorway frequently, as it was the door through which engines went out, and while he was working as hostler the testimony showed that he passed in and out of the doorway from 3 to 25 times in each day.

One witness, who had worked for more than a year in this engine house as engineer and hostler and was acquainted with the doorway, testified that he "should think any engineer going out of that doorway would know there wasn't clearance enough there to go through on the outside of the engine." Another witness who had worked for defendant for nine years as engineer, fireman, and hostler, and whose duties took him to this engine house a great many times, testified that he knew he would be in danger if he jumped on the engine as it went through the door. Another witness who had worked for defendant as fireman, engineer, and hostler, testified that he had got on his engine "when it wasn't very far from the door"; that:

"It was dangerous; there wasn't clearance enough. I knew it was dangerous; anybody would know it was dangerous if they looked at it. *. * * If I got squeezed there, I would have got killed."

He also said that it was perfectly visible to anybody using the type of engine of No. 2951 that the clearance was very narrow. Another witness, who had been in the service of the defendant for 22 years, and who worked as hostler at this roundhouse, and was acquainted with this particular doorway, and had seen engineers board engines there and knew it had been the custom for them to do so for eight or nine years, testified that "it was perfectly apparent to any one" that on

some of the engines the clearance was so small that a man couldn't ride on the outside and get through. And another witness who had been in defendant's service as engineer and hostler, and had worked in this engine house for seven years, and who had got on his engine when in motion and about to go through the doorway, testified that "everybody did it," said he knew it was a narrow clearance, and that if he did not get in the engine he would get hurt. "I was well aware I couldn't ride on the outside of the engine and go through that doorway. Anybody could see that as they stood and looked at it." These witnesses were all the plaintiff's own witnesses, and the testimony quoted was brought out upon cross-examination, and there is nothing in the record contradictory of it.

There is proof in the record that the engineers and hostlers were accustomed to board moving engines about to pass through this door way, but there is no proof that any duty required them to do so; and, in the absence of such proof, it is difficult to see how the defendant could be held guilty of negligence in not providing against such a contingency. It was not the duty of defendant to see that this roundhouse was made equal to the newest and safest of its engine houses, but its duty was discharged when it furnished such a place as was reasonably safe and suitable for the purposes had in view. And as it was not intended or supposed that engineers or hostlers would get upon their engines as they were about to pass through this doorway, no duty requiring them to do so, there would seem to be no evidence that the roundhouse was unsuitable for its purpose.

We think the case is governed by the case of New York, N. H. & H. R. Co. v. Dailey, 179 Fed. 289, 102 C. C. A. 660, decided by this court in 1910. The plaintiff in that case, as the plaintiff's intestate in this case, was employed as an engine hostler at defendant's roundhouse. A dead engine with no air to operate the brakes came in and was turned over to him, and a coemployé with another engine kicked it into the roundhouse from the turntable. It was given such speed that plaintiff was afraid that it would go through the building, and started to jump off to block the wheels, when he struck the post between the stalls and was injured. There was a clearance between the engine and post of about 11 inches. The evidence showed that, so far as known, no similar accident had ever occurred; it being the duty of the hostler, under ordinary circumstances, to remain on the engine. We held that defendant was not chargeable with negligence because the space was not greater, the construction being safe for employés under any circumstances to be reasonably anticipated. In the course of our opinion we said:

"The defendant was not, however, required to guard against such an extraordinary combination of circumstances as produced the injury in question. The opening into the stalls of the roundhouse between the posts was ample for all ordinary conditions and, having provided such a structure, the defendant cannot be held responsible because the plaintiff saw fit to attempt to alight at the very moment when the engine was passing the posts. If the contention of the plaintiff be sustained by the courts, it necessarily follows that the owner of a stable who has provided ample room for his horses and carriages to enter can be held liable if his coachman loses control of the horses and receives injuries in an attempt to descend from the vehicle at the moment it is passing through the door. It will hardly be contended that the

owner of a garage is required to provide an entrance wide enough, not only to admit the motor car with perfect safety, but also sufficiently ample to enable the chauffeur, should the machine become unmanageable, to leap out while passing through the entrance. We know of no rule holding a master to such extreme care. If he provides structures which guard against all accidents which can reasonably be foreseen, he has done his duty to those whom he employs."

So in the case at bar, the defendant was not guilty of negligence as respects the construction of the roundhouse. The doorway through which the engine passed, while narrower than in some of the more recently constructed roundhouses of the road, and three inches less than in the Dailey Case, was sufficient for all ordinary conditions, and defendant cannot be held responsible because the plaintiff's intestate saw fit to attempt to mount his engine just as it was about to pass through this door. It was not required to guard against any such extraordinary conduct as that an engineer or an engine hostler would attempt to enter his engine at that particular point. His duties did not make it necessary for him to do so, and no superior officer directed him on this occasion, or at any other time, to do so foolhardy a thing. And it was not customary for the men to enter their engines at that point either when the engines were moving or standing still. There was no reason, if he desired to get aboard his engine before it went through the door, why he should not have had the fireman who was running it bring the engine to a stop, or why he should not have entered it on the other side of the door. The testimony was that there was no emergency about the matter. The engine was simply going out to the water tank to take water, and was then to be placed on the storage track.

As the defendant was not negligent, it is unnecessary for us to consider whether the plaintiff's intestate, as matter of law, assumed the risk, although the question was discussed at some length in the argument.

Judgment affirmed.